RECEIVED

DEC - 4 2013

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

IN THE MATTER OF LARRY
DOIRON, INC. AS OWNER AND
OPERATOR OF THE BARGE POGO
and THE M/V BILLY JOE

CIVIL ACTION NO. 11-1510

JUDGE DOHERTY

MAGISTRATE JUDGE HILL

### RULING

At issue in this matter is the law applicable to the claim asserted by third party plaintiff, Peter Paul Savoie, against third party defendant, Apache Corporation, the platform owner. Accordingly, the Court instructed counsel to submit briefing on this issue. [*See* Doc. Nos. 53, 73, 93, 95] The briefing has now been received, and the Court finds as follows:

### Background

On August 19, 2011, Larry Doiron, Inc. ("LDI") filed a complaint for "exoneration from or limitation of liability." [Doc. 1] On September 30, 2011, Savoie filed a claim for injuries against LDI, as well as a third party complaint against Apache.[1] [Doc. 6] Savoie asserts he was injured on February 25, 2011, while working on a fixed production platform owned by Apache Corporation and located on navigable waters in West Lake Verret, St. Martin Parish, Louisiana (i.e., state waters). [Doc. 6, pp. 10-11] Mr. Savoie was employed by Specialty Rental Tools & Supply, L.L.C. ("STS")

---

[1]Apache has also filed a claim against LDI in the limitation proceeding. [Doc. 8]

as a Field Supervisor III. Apache hired STS to perform a "flow back" job[2] on its platform.

At the time of the incident at issue, Savoie was performing the "flow back" job on the platform.  The first attempt at the flow back job was unsuccessful.  Savoie advised Apache's company man (Brandon LePretre) that larger equipment was needed, including a crane barge.[3] Thereafter, Mr. LePretre contacted VAS Gauging, Inc. (an Apache contractor) and arranged for VAS to provide a crane barge to assist STS in the flow back job.  VAS then contacted LDI and had LDI provide the crane barge POGO[4] for use at Apache's platform.  The larger equipment and the crane barge POGO were brought to the site, but the flow back job was still unsuccessful.

While attempting to disassemble the flow back equipment from the well on the platform, the chicksan became lodged in the grease zerk.  Savoie then removed the chiksan from the grease zerk and gave the crane operator (who was on the vessel) the signal to boom down. According to Savoie, rather than booming down, "All of a sudden the load come [sic] toward me very fast.  When it did that, it knocked me off balance, I was going back, so I grabbed the chicksan [sic] to hold on." [Doc. 69-2, pp. 142-44]  Savoie testified as he held the chiksan from his position on the platform, the crane operator continued to boom up.  "Then when I tell him to stop - - He wanted to put me down on the platform.  I said, 'No, put me down on the barge.'  So he started to come down.  It just took him a long time to get me down.  I couldn't hold on anymore.  I slipped and was kind of grabbing for a grasp and I fell." [Id. at 144]  Savoie asserts he fell approximately eight feet, onto the deck of the

---

[2]According to the parties, a "flow back" job is an operation designed to clean up a well and increase production.

[3]Mr. LePretre testified Savoie told him the crane barge was needed, because the larger equipment was too heavy for the workers to remove from the wellhead.  [Doc. 58-8, pp. 25-26, 32-33]

[4]The POGO is a self-propelled construction barge owned and operated by LDI. [Doc. 1, p.1]

POGO, resulting in "a crush type injury to the right lower extremity." [Doc. 6, pp. 11, 14]

Accordingly, at the time of Savoie's accident, Savoie was working from a platform on an attached well located in state waters, and Savoie alleges he was injured when he was knocked off the platform and onto the deck of a vessel afloat in navigable water.  As to Savoie's specific allegations of negligence against Apache, Savoie alleges he was injured due to the actions of Apache, in that Apache failed to eliminate hazards in the workplace, failed to mitigate hazards in the workplace, failed to provide adequate hand rails around the perimeter of its platform, and failed to comply with industry standards [Doc. 6, pp. 18-19] The issue is whether the foregoing facts, as to Apache, give rise to a maritime tort against Apache (and hence, the application of maritime law) as argued by plaintiff, or a land-based tort (and hence, the application of Louisiana state law) as argued by Apache.

Savoie and Apache (as well as this Court) agree this Court has subject matter jurisdiction over Savoie's claim against Apache.[5] [Doc. 98, p.3; Doc. 81, p.5] All relevant parties (as well as this Court) agree the law applicable to Savoie's claim against LDI is general maritime law. [Doc. 80, p.3; Doc. 83; *see also* transcript of telephone conference held April 29, 2013] What remains at issue is the law applicable to Savoie's claim against Apache.

---

[5]All parties, as well as the Court, agree admiralty jurisdiction exists over the claim asserted by Savoie against LDI in the limitation proceeding.  *See* transcript of telephone conference held April 29, 2013 [Doc. 93].  Accordingly, even if Savoie's claim against Apache does not fall within admiralty jurisdiction, this Court would exercise supplemental jurisdiction over that claim, as LDI and Apache are joint tortfeasors.  *See e.g. Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 541 (1995); *Just v. Chambers*, 312 U.S. 383, 386 (1972)("The limitation extends to tort claims even when the tort is non-maritime").

## Analysis

**1.      Applicable Standard**

Historically, one would look to the relevant tortfeasor and its conduct or activities, as they relate to the incident and maritime activity, to determine whether maritime law would apply to the claim against that tortfeasor.  However, regrettably, with time this rather straight forward and well settled analysis has been eroded or at least augmented.  According to more recent Fifth Circuit jurisprudence, "The test to determine the existence of a cause of action in maritime tort is identical with that applied to determine jurisdiction in admiralty."[6] *May v. Transworld Drilling Co.*, 786 F.2d 1261, 1265 (5th Cir. 1986); *Hamm v. Island Operating Company, Inc.*, 450 Fed.Appx. 365, 368 (5th Cir. 2011).  Consequently, one must look to the analysis for determining maritime jurisdiction.  The Supreme Court has set forth the test for establishing admiralty *jurisdiction* over tort claims (and thus, it would seem, the test to determine the existence of a cause of action in maritime tort), in *Grubart v. Great Lakes Dredge & Dock Co.*:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the

---

[6]The conflation of these two issues - i.e. whether admiralty jurisdiction is present and whether a cause of action is a maritime tort and/or whether maritime law would apply to a given claim against a given tort feasor- can be problematic, as many cases suggest the two analyses are conflated for all purposes.  However, the two analyses are not necessarily the same, nor is the legal consequence of one always the legal consequence for the other.  *See e.g. Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 545-46 (1995)("Contrary to what the city suggests . . ., exercise of federal admiralty jurisdiction does not result in automatic displacement of state law.") Here, as noted, maritime jurisdiction is not in dispute, as this matter commenced as a limitation proceeding, which falls under maritime jurisdiction.

4

incident shows a substantial relationship to traditional maritime activity.

*Grubart v. Great Lakes*, 513 U.S. 527, 533 (1995)(internal citations and quotation marks omitted);

*see also Gulf Coast Shell and Aggregate LP v. Newlin*, 623 F.3d 235, 240 (5th Cir. 2010).

The Court therefore will apply the *Grubart* test to the facts alleged by Savoie.

**2.      Location Test**

The location element is satisfied if one views this test as one of where injury was suffered

rather than where the tort occurred.  Savoie suffered his injury on the deck of the crane barge POGO,

which neither party disputes was a vessel afloat in navigable water.  *Hamm* at 368; *see also Egorov,*

*Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir.

1999)("In determining whether the tort occurred on navigable water, this court looks to where the

alleged *wrong took effect rather than the locus of the allegedly tortious conduct*")(emphasis added);

*Taylor v. Kennedy Engine, Inc.*, 861 F.2d 127, 128-29 (5th Cir. 1988) (*A tort occurs on navigable*

*waters when the plaintiff sustains his injury on navigable waters, even if the tortious act occurs on*

*land*).

**3.      Connection Test**

**a.      General Features of the Type of Incident Involved**

"The connection test raises two issues. A court, first, must assess the general features of the

type of incident involved, to determine whether the incident has a potentially disruptive impact on

maritime commerce." *Grubart* at 533.  "Before determining if the activity at issue is of a sort with

potential to disrupt maritime commerce, courts should characterize the activity at issue at an

'intermediate level of generality.'" *Scarborough v. Clemco Industries*, 391 F.3d 660, 664-65 (5th Cir.

2004); *Grubart* at 538 (Courts are required to focus "not on the specific facts at hand but on whether

the 'general features' of the incident [are] 'likely to disrupt commercial activity'")(citing *Sisson v. Ruby*, 497 U.S. 358, 363 (1990)).  The Court finds the activity at issue in this matter, when viewed in globo, and characterized at an intermediate level of generality, consists, also, of the negligent operation of a crane on a vessel that, in turn, causes injuries to an oil and gas worker, by causing the worker to drop or fall onto the vessel.  The Court finds such an incident has a potentially disruptive impact on maritime commerce, as injuring a worker on a vessel "can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel."  *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995).

> **b.      General Character of the Activity Giving Rise to the Incident**

After determining whether the incident has a potentially disruptive impact on maritime commerce, "a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart* at 533. "For this second inquiry, we ask 'whether **a tortfeasor's activity**, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the case at hand.'" *Coats* at 1119 (quoting *Grubart* at 539)(emphasis added).  Here, *the tortfeasor at issue in this Ruling* is not the vessel or crane operator on the vessel, *rather it is Apache, the platform owner*. [Doc. 81, p.1]  The Court concludes, when looking to *the relevant tortfeasor's activities* (i.e., Apache), the general character of Apache's activities giving rise to the incident in this matter do not show a substantial relationship to traditional maritime activity, for the reasons that follow.

In this matter, Apache's activity giving rise to this suit was a "flow back" job, on a fixed platform, which, according to the parties, is an operation designed to clean up an oil well and

6

increase production. There is nothing inherently maritime about such a task. Just as "exploration and development of the Continental Shelf are not themselves maritime commerce," this Court finds exploration and development of lands submerged under state territorial waters likewise do not, necessarily, constitute maritime commerce. *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985); *see also Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 217 (5th Cir. 2013)("[O]ur case law reflects that incidents which occur *as a result* of offshore drilling are . . . generally not maritime in nature")(emphasis in original).

The only connections, *as to Apache*, between this incident and traditional maritime activity are the use of a crane barge (which was providing services to the Apache platform), and the fact that the injuries to Savoie (a non-seaman) fortuitously occurred on that crane barge. It is merely a fortuitous circumstance that the crane dropped Savoie, an oil and gas worker performing his work on a fixed platform, onto the barge rather than the platform.[7] *See e.g. In re: Dearborn Marine Service, Inc.*, 499 F.2d 263, 273 (5th Cir. 1974)(wrongful death claim brought by the estate of a platform worker, who was only fortuitously on a vessel when he died from an explosion and fire occurring on a platform which enveloped the vessel, was governed by state law under OCSLA rather than admiralty law). Furthermore, the specific allegations of negligence against this particular tortfeasor are that Apache failed to eliminate hazards in the workplace, failed to mitigate hazards in the workplace, failed to provide adequate hand rails around the perimeter of its platform, and failed to comply with industry standards. [Doc. 6, pp. 18-19] There is nothing inherently maritime about any of these activities. For all of these reasons, the Court finds plaintiff's tort claims against Apache

---

[7]Indeed, according to Savoie's testimony, the crane operator first attempted to place Savoie on the platform, but Savoie instructed the crane operator to place him on the barge.

7

are land-based, and therefore, Louisiana state law will apply to those claims.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this ___4___ day of December, 2013.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

8